**FILED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FEB **1 3** 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

|                                                                                                                                                                                                                                                                                    |    |                        |
| ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- | -- | ---------------------- |
| UNITED STATES OF AMERICA,                                                                                                                                                                                                                                                           | )  |                        |
|                                                                                                                                                                                                                                                                                    | )  |                        |
| Plaintiff,                                                                                                                                                                                                                                                                          | )  |                        |
|                                                                                                                                                                                                                                                                                    | )  |                        |
| v.                                                                                                                                                                                                                                                                                 | )  | No.                    |
|                                                                                                                                                                                                                                                                                    | )  |                        |
| ASIM MUHAMMAD ALI, M.D., ALEXIS DORJAY BUTLER, SHAUNTA C. CROSBY, ERIN MELISSA HERMAN, VLADIMIR KOGAN, JERRY DALE LEECH, D.C., STANLEY L. LIBRACH, M.D., DENIS J. MIKHLIN, EBONY R. PRICE, ERICA T. SPATES, and TIJUANA A. SPATES,                                                     | )  | **4:20CR098 HEA/JMB**  |
|                                                                                                                                                                                                                                                                                    | )  |                        |
| Defendants.                                                                                                                                                                                                                                                                        | )  |                        |

## INDICTMENT

The Grand Jury charges:

## BACKGROUND

### Defendants

1.     At all times relevant to this indictment, defendant Stanley L. Librach, M.D.

("Dr. Librach"), was a medical doctor, licensed to practice in the state of Missouri.   Since in or

about February 2009, Dr. Librach has owned, operated, or been the medical director for one or

more health care related businesses, including American Pain Institute, LLC ("API"); Institute

for Pain Management, LLC ("IPM"); and Stanley Librach, M.D., D.D.S., LLC ("Librach,

LLC").

2.     At all times relevant to this indictment, defendant Asim Muhammad Ali, M.D.

("Dr. Ali") has been a medical doctor, licensed in the state of Missouri.   Since in or about

February 2011, Dr. Ali has owned, operated, or been the medical director for one or more health

care related businesses, including IPM, AMA Physician Group, LLC, and Central Diagnostic

Laboratory ("CDL").

    3.      At all times relevant to this indictment, defendant Jerry Dale Leech, D.C.

("Dr. Leech") was a doctor of chiropractic medicine, licensed to practice in the state of Missouri.

Dr. Leech has never been licensed as a medical doctor or otherwise authorized to practice as a

medical doctor in the United States.   Since in or about April 2014, Dr. Leech has owned,

operated, or managed one or more health care related businesses, including API, IPM, American

Pain Clinic, Midwest Medical Marketing, LLC, and Institute for Regenerative Medicine, LLC.

    4.      At all times relevant to this indictment, defendant Denis J. Mikhlin ("Mikhlin")

was a resident of St. Louis County, Missouri.   Since in or about June 2013, Mikhlin has owned

and operated one or more health care related businesses, including Doctors on the Go, LLC;

Doctors on the Go1, LC (jointly referred to as 'DOTG'); and D. Mikhlin Enterprises, LLC.

    5.      At times relevant to this indictment, defendant Alexis Dorjay Butler was a

resident of St. Louis City, Missouri.

    6.      At times relevant to this indictment, Shaunta C. Crosby ("Crosby") was a resident

of St. Louis County, Missouri and was a recipient in the Missouri Medicaid Program

("Medicaid").

    7.      At times relevant to this indictment, defendant Erin Melissa Herman ("Herman")

was a resident of St. Louis County, Missouri.

    8.      At times relevant to this indictment, defendant Vladimir Kogan was a resident of

2

St. Louis County, Missouri.

9.      At times relevant to this indictment, defendant Ebony R. Price ("Price") was a resident of St. Louis City, Missouri and a Medicaid recipient.

10.     At times relevant to this indictment, defendant Erica T. Spates ("E. Spates"), was a resident of St. Louis County, Missouri and a Medicaid recipient.

11.     At times relevant to this indictment, defendant Tijuana A. Spates ("T. Spates") was a resident of St. Louis City, Missouri and a Medicaid recipient.

12.     At all relevant times, Dr. Librach, Dr. Leech, Dr. Ali, and Mikhlin, either as individuals or through their businesses, were approved Medicare and Medicaid providers and submitted, or caused to be submitted, reimbursement claims to Medicare, Medicaid, Tricare, and other health care benefit programs for services they purportedly provided, supervised, or ordered.

## Relevant Medicare Provisions

13.     The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled.   Medicare Part B reimburses health care providers for covered health services that they provide to Medicare beneficiaries in outpatient settings.

14.     CMS acts through fiscal agents called Medicare Administrative Contractors or "MACs" which are statutory agents for CMS for Medicare Part B.   The MACs are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries.   The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service.

3

Wisconsin Physicians Service Insurance Corporation (WPS) is the Part B MAC for Eastern

Missouri and thus processes reimbursement claims that Dr. Librach, Dr. Ali, CDL, API, IPM.

and DOTG submit to Medicare.

15.     To receive Medicare reimbursement, providers must make appropriate application

to the MAC and execute a written provider agreement.   The provider agreement obligates the

provider to know, understand, and follow all Medicare regulations and rules.   After successful

completion of the application process, the MAC assigns the provider a unique provider number,

which is a necessary identifier for billing purposes.

16.     Medicare providers must retain clinical records for the period required by state

law or five years from date of discharge if there is no requirement in state law.

Defendant Dr. Librach's Enrollment in Medicare

17.     Between 2012 and 2016, defendant Dr. Librach completed and signed several

Medicare enrollment applications.   He first applied in 2012 as an individual provider and later

applied in March 2014 as the "MD managing owner" of API.   Contained in both applications

was Section 14, entitled "Penalties for Falsifying Information," which informed Dr. Librach that

he could be criminally prosecuted (a) for executing or attempting to execute a health care fraud

scheme or using false or fraudulent statements or representations to obtain money from a health

care benefit program or (b) making or using false or fraudulent statements or representations in

connection with the delivery or payment for health care benefits, items, or services.

18.     As part of the September 2012 and March 2014 applications, Dr. Librach signed

the "Certification Statement" of the application and thereby certified:

> I have read and understand the Penalties for Falsifying Information, as printed in
> the application.   I understand that any deliberate omission, misrepresentation, or

4

falsification of any information . . . contained in any communication supplying information to Medicare . . . [may be criminally prosecuted].

I agree to abide by the Medicare laws, regulations and program instructions . . . including the Federal anti-kickback statute . . .

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

Defendant Dr. Ali's Enrollment in Medicare

19.     Dr. Ali completed several Medicare provider enrollment applications, including one in or about February 2015 as an individual and one in or about April 2016 in which he is identified as the owner and medical director of IPM.   These applications contained the same Section 14, "Penalties for Falsifying Information," and Section 15, "Certification Statement," described above.   Thus, Dr. Ali was given notice of the penalties for falsifying information to Medicare and certified that he would comply with the laws, regulations, and policies applicable to Medicare.

Defendant Dr. Leech's Enrollment in Medicare

20.     Dr. Leech completed several Medicare provider enrollment applications, including one in or about October 2013 as an individual provider and one in or about March 2014 as the "DC/Managing Owner" of API.   Both of these applications contained a section, entitled "Penalties for Falsifying Information," and a "Certification Statement."   Thus, Dr. Leech was given notice of the penalties for falsifying information to Medicare and certified that he would comply with the laws, regulations, and policies applicable to Medicare.

Defendant Mikhlin's Enrollment in Medicare

21.     In or about August 2014, Mikhlin completed a Medicare provider enrollment

5

application for DOTG, which Mikhlin owned and incorporated in or about June 2014.   This

application contained the same Section 14, "Penalties for Falsifying Information," and Section

15, "Certification Statement" described above.   Thus, Mikhlin was given notice of the penalties

for falsifying information to Medicare and certified that he would comply with the laws,

regulations, and policies applicable to Medicare.

### Relevant Missouri Medicaid Provisions

22.     MO HealthNet administers the Missouri Medicaid Program, which is jointly

funded by the State of Missouri and the federal government.   Missouri Medicaid reimburses

health care providers for covered services rendered to low-income Medicaid recipients.

23.     A Medicaid provider must enter into a written agreement with MO HealthNet to

receive reimbursement for medical services to Medicaid recipients and must agree to abide by

MO HealthNet's regulations in rendering and billing for those services.

24.     On about September 4, 2004, May 9, 2016, December 20, 2013, and

February 20, 2015 respectively, defendants Dr. Librach, Dr. Ali, Dr. Leech, and Mikhlin signed

Missouri Medicaid provider agreements that contained the following language:

> By my signature below, I, the applying provider, read and agree that, upon
> the acceptance of my enrollment, I will participate in the Vendor Payment plan.
> I am responsible for all services provided and all billing done under my provider
> number regardless to whom the reimbursement is paid.   It is my legal
> responsibility to ensure that the proper billing code is used and indicate the length
> of time I actually spend providing services regardless to whom the reimbursement
> is paid.   I agree to be financially responsible for all services, which are not
> documented.   I agree the Missouri Title XIX Medicaid manual, bulletins, rules,
> regulations and amendments thereto shall govern and control my delivery of
> services and further agree to the following terms:
>
> I agree that it is my responsibility to access manual materials that are
> available from DMS over the Internet.   I will comply with the Medicaid manual,
> bulletins, rules, and regulations as required by the Division of Medical Services

6

and the United State Department of Health and Human Services in the delivery of services and merchandise and in submitting claims for payment.   I understand that in my field of participation I am not entitled to Medicaid reimbursement if I fail to so comply, and that I can be terminated from the program for failure to comply.

25.     Medicaid providers must retain, for five years from the date of service, fiscal and medical records that reflect and fully document services billed to Medicaid and must furnish or make the records available for inspection or audit by the Missouri Department of Social Services or its representative upon request.   Failure to furnish, reveal, or retain adequate documentation for services billed to the Medicaid Program may result in recovery of the payments for those services not adequately documented and may result in sanctions to the provider's participation in the Medicaid Program.   This policy continues to apply in the event of the provider's discontinuance as an actively participating Medicaid provider through the change of ownership or any other circumstance.

### Relevant Tricare Provisions

26.     Tricare is a federally funded program that reimburses for health care services provided to active, retired, reserve, guard, and uniformed service members and their families. The Defense Health Agency ("DHA") is a joint, integrated agency that supports the delivery of health services to military health system beneficiaries.   DHA exercises management responsibility for Tricare and receives, processes, and pays claims on behalf of Tricare.

### Current Procedural Terminology (CPT) Codes

27.     In presenting reimbursement claims to health insurance companies, health care providers use numeric codes, known as "CPT Codes," to describe the services they provide. The CPT codes are contained in the Physicians Current Procedural Terminology manual.   The

7

CPT manual is published by the American Medical Association (AMA) and its body of physicians of every specialty, who determine appropriate definitions for the codes.   By submitting claims using these CPT codes, providers represent to the insurance companies and their patients that the services described by the codes were in fact provided.

28.     Reimbursement rates for the CPT codes are set through a fee schedule, which establishes the maximum amount that the provider will be paid for a given service, as identified by the CPT code.

## Relevant Provisions Concerning Controlled Substances

29.     Certain prescriptions drugs are defined by federal and state law as controlled substances, which are drugs that have some potential for abuse or dependence.   Controlled substances are placed into one of five schedules, based on the potential for abuse and the severity of the effects if a person abuses the drug.   Of the controlled drugs that can legally be prescribed, Schedule II drugs have the highest potential for abuse because of the risks of severe psychological or physical dependence.   Oxycodone, oxycodone-acetaminophen, and fentanyl are Schedule II drugs.   Xanax is a Schedule IV drug and Lyrica is a Schedule V drug.

30.     Federal regulation, 21 CFR 1306.04(a), provides that:

a prescription drug for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.   The responsibility for the proper prescribing of a controlled substances is upon the prescribing practitioner . . .. An order purporting to be a prescription issued in the usual course of professional practice . . . is not a prescription within the meaning of section 309 of the Act (21 U.S.C. 829) and the person . . . issuing the [purported prescription] shall be subject to the penalties provided for violations of the provision of law relating to controlled substances.

31.     The Missouri Board of Registration for the Healing Arts ("Board") licenses and regulates medical doctors and certain other health care practitioners.   The Board prohibits

8

medical doctors from signing a blank prescription form or otherwise prescribing a "drug, controlled substance or other treatment" unless the doctor has established a physician-patient relationship and conducted a sufficient examination of the patients.   See R.S. Mo. 334.100(2)(4).

### Federal Anti-Kickback Statute

32.     Compliance with the Anti-Kickback Statute Act (42 U.S.C. § 1320a-7b(b)) ("AKS") is a condition of payment for both Medicare and Medicaid.   In other words, Medicare and Medicaid will not pay for services that are provided in violation of the AKS.

33.     The AKS makes it a criminal offense for any person to knowingly and willfully solicit, offer, pay or receive remuneration in return for or to induce any person to refer, recommend, furnish, or arrange for the furnishing of any items, goods, and services, paid in whole or in part by any federally funded health care program.   Both parties to such an arrangement may be criminally liable if one purpose of the arrangement is to obtain remuneration for the referral of services or to induce referrals.

34.     Remuneration is broadly defined as anything of value, including money, goods, services, or the release or forgiveness of a financial obligation that the other party would normally have to pay.   In passing the AKS, Congress intended to prohibit financial incentives that could affect the medical judgment of those providing or referring patients for health care services

### Count 1
### Conspiracy
### 18 U.S.C. § 371

35.     Paragraphs 1 to 34 are incorporated by reference as if fully set out herein.

36.     Beginning in or about October 2013, and continuing to in or about April 2018, in the Eastern District of Missouri and elsewhere,

9

ASIM MUHAMMAD ALI, M.D.,
ALEXIS DORJAY BUTLER,
SHAUNTA C. CROSBY,
ERIN MELISSA HERMAN,
VLADIMIR KOGAN,
JERRY DALE LEECH, D.C.,
STANLEY L. LIBRACH, M.D.,
DENIS J. MIKHLIN,
EBONY R. PRICE,
ERICA T. SPATES, and
TIJUANA A. SPATES,

the defendants herein, and persons known and unknown to the Grand Jury, did unlawfully, willfully, and knowingly combine, conspire, and agree with persons known and unknown to the grand jury to commit the following offenses against the United States:

    a.  to knowingly and intentionally prescribe a controlled substance outside the normal course of professional practice and for no legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a)(1) and 843(a)(1);

    b.  to acquire and obtain possession of controlled substances by misrepresentation, fraud, forgery, deception, and subterfuge, in violation of Title 21, United States Code, Section 841(a)(3);

    c.  to defraud a health care benefit program and to obtain, by false and fraudulent representations, money owned by and under the control of a health care benefit program, in connection with the delivery and payment of health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347;

    d.  to knowingly and willfully solicit, offer, pay, and receive any kickback, bribe, and rebate for referrals that are reimbursed in whole or part by a federal health

10

care benefit program, in violation of Title 42, United States Code, Section 1320-7a-7b; and

e.  to knowingly transfer, possess, and use, without lawful authority, a means of identification of another person in connection with any unlawful activity that constitutes a violation of federal law or is a felony under state or local law, in violation of Title 18, United States Code, Section 1028(a)(7).

## Purpose of the Conspiracy

37.  The purpose of the conspiracy was for:

a.  doctors and unauthorized persons to accept cash for illegally writing prescriptions for controlled substances for individuals outside the usual course of medical practice and without a legitimate medical purpose;

b.  defendants and their co-conspirators to identify and recruit individuals who, in return for money or controlled substances, would permit their names to be used on fraudulent prescriptions, take the fraudulent prescriptions to pharmacies to be filled, and purchase and sell the controlled substances obtained through the fraudulent prescriptions; and

c.  defendants and their co-conspirators to solicit, offer, pay, and receive illegal kickbacks for specimens and prescriptions referred and sent to certain medical testing laboratories and pharmacies.

## Manner and Means of the Conspiracy

38.  It was part of the conspiracy that Dr. Librach, Dr. Leech, Dr. Ali, and others incorporated and operated the medical practices and laboratories, identified below, and used

11

these businesses as a means of committing the criminal offenses described in this indictment.

39.    It was part of the conspiracy that in or about February 2014, Dr. Librach and

Dr. Leech incorporated and opened API, which described itself as a multilevel pain management

clinic providing chiropractic, medical, and other health related services.   In or about August

2014, in a Medicaid application, Dr. Leech identified himself as an 82% owner of API and

Dr. Librach as an 18% owner of API.   Dr. Librach was the medical director and supervised API

nurse practitioners and Dr. Leech was the day-to-day manager of API.

40.    On or about March 15, 2016, Dr. Leech received a letter from WPS, notifying him

that his and API's Medicare billing privileges were revoked.   The revocation stemmed from a

false statement Dr. Leech made on an earlier Medicare application.

41.    About two weeks after receiving the revocation letter, on or about April 1, 2016,

Dr. Leech and Dr. Librach submitted another Medicare application for API.   However, in this

subsequent application, Dr. Leech was not listed as co-owner with Dr. Librach.   Instead, in an

attempt to conceal Dr. Leech's involvement with API, Dr. Leech's mother was listed as a co-

owner.   Medicare denied this application, which meant API could no longer bill Medicare for

services.

42.    In the same month, April 2016, Dr. Ali and Dr. Leech's wife opened IPM and

identified themselves as the owners.   Dr. Leech subsequently, in December 2017, registered

IPM in the state of Missouri and listed his mother as the organizer of IPM.   Dr. Leech identified

himself as the "Chief of Staff" of IPM and similar to his role at API, exercised control over all

aspects of IPM.   At times, IPM operated out of several locations, including Woodfield Lane,

Old Tesson Ferry Road, and Grandview Plaza in St. Louis County.

12

43.     Dr. Ali served as the medical director of IPM from in or about April 2016, until he resigned in or about January 2018.   Then, Dr. Librach assumed the role of medical director for IPM.   While medical director, Dr. Ali and Dr. Librach were responsible for supervising the IPM nurse practitioners.

44.     API and IPM employed medical assistants, advanced nurse practitioners, and chiropractors, none of whom were authorized under state or federal law to prescribe controlled substances.

Dr. Librach and Dr. Ali Pre-Signed Prescriptions for Controlled Substances

45.     It was part of the conspiracy that either Dr. Librach or Dr. Ali would typically be present at API, and later IPM, one day a week for about two hours.   Dr. Librach or Dr. Ali usually came to the clinic on Wednesdays or Fridays to pre-sign prescriptions to be given to patients on their next visit to the clinic.   Dr. Librach and Dr. Ali did not physically see, examine, or evaluate the patients on the dates they signed the prescriptions or the dates the patients actually received the controlled substance prescriptions.

46.     On April 16, 2018, during an inspection, the Board of Narcotics and Dangerous Drugs ("BNDD") found 165 pre-dated controlled substance prescriptions, which Dr. Librach had signed.   These prescriptions were to be given to patients during visits scheduled between April 16, 2018 and April 20, 2018.   As previously stated, under federal and state law, medical doctors may not pre-sign and pre-date prescriptions for controlled substances.

47.     It was further part of the conspiracy that Dr. Librach and Dr. Ali pre-signed controlled substance prescriptions for patients, who over a period of months repeatedly tested negative for the prescribed controlled substances but tested positive for non-prescribed or illegal

13

controlled substances.   The patients' medical records, to the extent they exist, do not indicate

that Dr. Librach or Dr. Ali addressed the obvious diversion of the prescribed controlled

substances.

48.     It was further part of the conspiracy that Dr. Librach, Dr. Ali, and Dr. Leech

referred or caused IPM patients to be referred to Dr. Librach's drug addiction treatment program.

<u>Dr. Leech Distributed Illegal Controlled Substance Prescriptions</u>

49.     It was further part of the conspiracy that Dr. Leech knew that Dr. Librach and

Dr. Ali were pre-signing prescriptions for patients whom they did not see or evaluate, but

Dr. Leech took no action to stop this illegal practice.   In fact, Dr. Leech actively encouraged

doctors to prescribe controlled substances to patients who tested negative for the prescribed

drugs and tested positive for illegal street drugs.

50.   It was further part of the conspiracy that Dr. Leech used and signed the names of

doctors on controlled substance prescriptions although Dr. Leech knew he was not a licensed

medical doctor and was not authorized to write prescriptions.

51.     It was further part of the conspiracy that Dr. Leech knew Mikhlin was creating or

causing the creation of fraudulent controlled substance prescriptions for defendant Herman.   In

addition, when pharmacies called IPM regarding defendant Herman's controlled substance

prescriptions, it was Dr. Leech who approved early refills of the controlled substance

prescriptions.

52.     It was further part of the conspiracy that Dr. Leech solicited and received money

or other things of value from individuals in exchange for fraudulent prescriptions.   Dr. Leech

knew the individuals did not have a doctor-patient relationship with the doctors he listed or

14

caused to be listed on the fraudulent prescriptions.

53.     It was further part of the conspiracy that defendant T. Spates, accompanied at times by defendants Butler, Price, Erica Spates, and others met with Dr. Leech at IPM, usually two times a month. There, T. Spates would give Dr. Leech the names to be listed on the fraudulent controlled substance prescriptions and then wait for Dr. Leech to prepare the fraudulent prescriptions.

54.     It was further part of the conspiracy that Dr. Librach was listed as the prescribing doctor on many of the fraudulent prescriptions, although Dr. Leech knew Dr. Librach had not seen nor examined the individuals listed as patients on the fraudulent prescriptions.

55.     It was further part of the conspiracy that defendant T. Spates typically paid Dr. Leech between $200 and $500 for each prescription for controlled substances, including oxycodone and oxycontin prescriptions.   T. Spates paid Dr. Leech about $4,000 to $5,000 each time she received fraudulent prescriptions from him.

56.     It was further part of the conspiracy that defendants T. Spates, E. Spates, Price, and others recruited or identified individuals to be listed as patients on the fraudulent prescriptions. In reality, these individuals were relatives, friends and acquaintances of the defendants, were not patients of Dr. Librach, and did not have a doctor-patient relationship with Dr. Librach.

57.     Prior to their names being used, some individuals listed on the fraudulent prescriptions reached an agreement with T. Spates, permitting her to use their names on the fraudulent prescriptions.   As payment, T. Spates gave these un-indicted co-conspirators money or controlled substances obtained with the fraudulent prescriptions.   Other individuals did not

15

know their names were used on the fraudulent prescriptions until after the prescriptions were filled. Once they discovered their names had been used, T. Spates paid some of these individuals to keep them from reporting the fraud.

58.     It was further part of the conspiracy that defendants T. Spates, Price, E. Spates, and other co-conspirators had the fraudulent prescriptions filled at local pharmacies, including Walgreens and Shop 'n Save pharmacies.

59.     In some instances, pharmacies would call API or IPM to determine if a prescription was legitimate.   It was part of the conspiracy that Dr. Leech instructed the clinic staff to tell the pharmacies the prescriptions were legitimate, although he knew the prescriptions were fraudulent.

Mikhlin Distributed Illegal Controlled Substance Prescriptions

60.     It was part of the conspiracy that Mikhlin recruited individuals ("Recruits") to use fraudulent prescriptions to obtain controlled substances.   Very often, the fraudulent prescriptions were for oxycodone pills.   Mikhlin received the pills from the Recruits and paid them with pills, cash, or a combination of both.

61.     It was further part of the conspiracy that defendant Mikhlin recruited defendant Kogan to collect money and pills from the Recruits.   Additionally, Kogan sold fraudulent prescriptions and he and Mikhlin shared the proceeds.

62.     It was further part of the conspiracy that Mikhlin recruited defendant Herman and paid her for each fraudulent prescription that she filled.   Per the agreement, defendant Herman's name was used on the fraudulent prescriptions, which she filled, on many occasions at Olive Street Pharmacy as suggested by Mikhlin.

63.     It was further part of the conspiracy that Mikhlin used the name of Doctor #1 on fraudulent prescriptions even though Doctor #1 had no knowledge that his/her name was being used on the fraudulent prescriptions and Doctor #1 was no longer providing services to DOTG patients.

64.     Defendant Crosby worked for Mikhlin at DOTG from in or about December 2017 to in or about June 2018.   It was part of the conspiracy that Crosby told pharmacies, calling for verification of prescriptions, that the fraudulent prescriptions were valid and legitimate.

65.     During an extended period in 2018 when Mikhlin was away from DOTG, Mikhlin left Crosby in charge of DOTG. Mikhlin told Crosby to give numerous fraudulent prescriptions bearing the name of Doctor #1.   After Kogan sold the prescriptions, he then was to give Crosby the money he received for the fraudulent prescriptions.

66.     It was further part of the conspiracy that defendant Crosby prepared fraudulent prescriptions and obtained controlled substances for herself.

Dr. Ali Paid Mikhlin Illegal Kickbacks in Return for Referrals from IPM

67.     In or about June 2013, Mikhlin incorporated and opened D. Mikhlin Enterprises, LLC ("Mikhlin Enterprises").   Mikhlin Enterprises was a marketing company located in St. Louis, Missouri, which, among other things, referred urine specimens to medical testing laboratories.

68.     In or about August 2015, Dr. Ali incorporated and opened CDL, a medical laboratory located in St. Louis County, Missouri.   Dr. Ali and two other persons jointly owned CDL, which, among other services, performed urine drug tests.   In or about January 2016, Dr. Ali and other co-conspirators completed an application for CDL to participate in the Medicare

17

Program.   The application was approved and CDL became a Medicare provider.

69.     It was part of the conspiracy that Dr. Ali, Mikhlin, Dr. Leech, and other co-conspirators agreed that CDL would pay Mikhlin Enterprises for each urine specimen that IPM and API sent to CDL.   By so doing, Dr. Ali sought to benefit financially from having urine tests performed at CDL for the same patients for whom he had over-prescribed controlled substances. Importantly, Dr. Ali did not use the results of the urine drug screens to inform or guide his treatment of the patients.

70.     It was further part of the conspiracy that on or about August 6, 2016, CDL wrote check #2617 to Mikhlin Enterprises for $8,260.00.   The memo line of the check states:   "Thank you!   July marketing fees – 236 samples."   In other words, CDL and Dr. Ali paid Mikhlin $35.00 for each sample he sent or caused to be sent to CDL in July 2016.

Dr. Ali Paid Dr. Leech Illegal Kickbacks in Return for Referrals from Dr. Librach and Others

71.     On or about February 23, 2016, Dr. Leech incorporated and opened Midwest Medical Marketing, LLC ("Midwest Marketing") in St. Louis, Missouri.   Midwest Marketing was a marketing company, which referred urine specimens to CDL and other labs.   It was part of the conspiracy that Dr. Ali, Dr. Leech, and Dr. Librach agreed that CDL would pay Midwest Marketing for each urine specimen that Dr. Librach and other un-indicted co-conspirators referred or sent to CDL.

72.     It was further part of the conspiracy that on or about April 30, 2017, CDL wrote check #3065 to Midwest Marketing for $7,840.00.   The memo line of the check states:   "April mkting fees" with the number 211 over 13, indicating that Midwest Marketing sent CDL 224 specimens for testing and CDL paid $35.00 for each of the 224 specimens it received from

18

Midwest Marketing.

Dr. Librach Received Illegal Kickbacks for Referrals to CDL and Others

73.     It was further part of the conspiracy that Dr. Ali and Dr. Librach agreed that CDL

would pay an employee of Dr. Librach, with whom Dr. Librach had a personal relationship,

$1,200.00 a month to induce Dr. Librach to refer specimens to CDL.   Dr. Librach deposited the

checks his employee received from CDL into a bank account solely owned and controlled by

him.

74.     It was part of the conspiracy that Dr. Librach received kickbacks in return for

prescriptions sent to a pharmacy, owned by un-indicted Co-conspirator #2.

## Overt Acts

75.     In furtherance of the conspiracy and to affect the objects of the conspiracy, the

following overt acts, among others, were committed in the Eastern District of Missouri:

    a.  On or about August 22, 2016, defendant Price caused a prescription (#18691)

        for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at

        Olive Street Pharmacy.   The prescription listed the patient as D.P. and listed

        Dr. Librach as the prescribing doctor.

    b.  On or about December 30, 2016, Dr. Ali wrote check #2443 from CDL's bank

        account to D. Mikhlin Ent for $12,915.00.

    c.  On or about January 29, 2017, defendant T. Spates sent the following text to

        defendant Price:   "She said you gone have to wait until she cash in the other

        script she gone keep those."

    d.  On or about February 28, 2017, defendant Herman caused two prescriptions,

19

one (#42061) for oxycodone Hcl 30mg, 90 count tablets, and one (#42062) for

phentermine 37.5 mg, 30 count tablets, to be filled at Olive Street Pharmacy.

e.   On or about May 26, 2017, an individual authorized by CDL wrote CDL

check #3116 to Dr. Librach's employee for $1,200.00.

f.   On or about May 30, 2017, Dr. Librach deposited check #3116 from CDL into

his Bank of America bank account.

g.   On or about September 12, 2017, defendant T. Spates sent a text message to

defendant Price.   In the text message was a notice from Walgreens

concerning a delay in a prescription for Patient T.A.

h.   On or about January 5, 2018, Dr. Ali wrote check #3551 for $10,000.00 to

Midwest Marketing.   The check was drawn on CDL's bank account.

i.   On or about January 12, 2018, defendant Dr. Ali pre-signed a controlled

substance prescription for Patient K.H.

j.   On or about March 8, 2018, at the direction of Mikhlin, Kogan provided a

fraudulent oxycodone prescription to un-indicted co-conspirator #1.   Un-

indicted co-conspirator #1 agreed to fill the fraudulent prescription for Kogan

in exchange for cash.

k.   On or about April 4, 2018, Dr. Leech authorized Olive Street Pharmacy in

St. Louis County, Missouri, to refill a fraudulent prescription, which listed

defendant Herman as the patient and Dr. Librach as the prescribing physician.

l.   On or about April 6, 2018, defendant Herman picked up a prescription for

phentermine 37.5 mg, 30 tablets, knowing the prescription was fraudulent.

20

m.  On or about May 14, 2018, defendant Crosby filled a fraudulent prescription at a Walgreens pharmacy in Ferguson.   The prescription listed Dr. Librach as the prescribing doctor and listed the patient as J.F.

n.  On or about June 12, 2018, defendant Crosby attempted to fill a fraudulent prescription at a Walgreens pharmacy in Hazelwood.   The prescription listed Doctor #1 as the prescribing doctor and listed the patient as J.F.

o.  On or about July 5, 2018, at the direction of Mikhlin and Crosby, Kogan provided a fraudulent oxycodone prescription to un-indicted co-conspirator #1.   Un-indicted co-conspirator #1 agreed to fill the fraudulent prescription for Kogan in exchange for cash.

p.  On or about July 9, 2018, Kogan obtained oxycodone pills from un-indicted co-conspirator #1, sold them to un-indicted co-conspirator #2, and returned approximately $950 to Crosby.

q.  On or about July 6, 2018, defendant Crosby drove unindicted co-conspirator #3 to Walgreens pharmacy where he/she tried to fill a fraudulent prescription. The prescription listed Doctor #1 as the prescribing doctor and listed the patient as J.L.

All in violation of Title 18, United States Code, Section 371.

### Counts 2-10
### Illegally Prescribing Controlled Substances
### 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2

76.  Paragraphs 1 to 34 and 38 to 73 are incorporated by reference as if fully set out herein.

21

Patient M.T.

77.     From in or about December 2015, to in or about April 2018, Dr. Librach wrote 24 controlled substance prescriptions for Patient M.T., but according to M.T.'s medical chart Dr. Librach only saw M.T. on one occasion.   While under Dr. Librach's care, M.T. tested positive for illicit drugs and/or non-prescribed controlled substances on 14 occasions.   On 8 occasions, M.T. tested negative for the drugs prescribed by Dr. Librach.   Despite knowing M.T. was not taking the prescribed drugs, Dr. Librach continued to write controlled substance prescriptions for M.T.

78.     From in or about December 2016, to in or about February 2018, Dr. Ali wrote 26 prescriptions for M.T.   According to M.T.'s medical chart, Dr. Ali only saw M.T. on two occasions, with Dr. Ali's first visit with M.T. occurring almost a year after he took over M.T.'s care.   According to M.T.'s medical chart, only two drug tests were performed while M.T. was under Dr. Ali's care; both were positive for illicit drugs and/or negative for the controlled substances prescribed for M.T.   Despite knowing M.T. tested positive for illicit drugs and negative for prescribed controlled substances, Dr. Ali continued to write controlled substance prescriptions for M.T.

Patient B.R.

79.     From in or about May 2015, to in or about October 2016, Dr. Librach wrote 83 controlled substance prescriptions for Patient B.R., but according to B.R.'s medical record, Dr. Librach never met B.R.   During this period, on 12 occasions, B.R. tested positive for illicit drugs and on 7 occasions tested negative for the prescribed controlled drugs.   Despite knowing B.R. was testing positive for illicit drugs and negative for the prescribed controlled substances,

22

Dr. Librach continued to write controlled substance prescriptions for B.R.

80.     From in or about October 2016, to in or about May 2018, Dr. Ali wrote 66 controlled substance prescriptions for Patient B.R., but according to B.R.'s medical record, Dr. Ali never met B.R.   During this period, even though B.R. had a long history of testing positive for illicit drugs on urine drug screens, there were no drug screen results in B.R.'s medical record for the 17-month period that B.R. was under Dr. Ali's care.   Despite knowing B.R.'s history, Dr. Ali continued to write controlled substance prescriptions for B.R.

Patient M.S.

81.     From in or about March 2016, to in or about October 2016, and from February 2018, to in or about April 2018, Dr. Librach wrote 23 controlled substance prescriptions for Patient M.S.   During this period, on two 2 occasions M.S. tested negative for the drugs Dr. Librach prescribed, and on 6 occasions M.S. tested positive for illicit drugs and/or non-prescribed controlled substances.   Despite knowing M.S. was not taking the prescribed drugs, Dr. Librach continued to write controlled substance prescriptions for M.S.

82.     From in or about November 2016, to in or about January 2018, Dr. Ali wrote 32 controlled substance prescriptions for M.S.   The medical chart of M.S. indicates that Dr. Ali saw M.S. on one occasion in September 2016.   The medical chart only includes two urine drug tests, both of which were positive for illicit drugs and/or negative for the controlled substances M.S. was prescribed.   Despite knowing M.S. had tested positive for illicit drugs and negative for the controlled substances prescribed, Dr. Ali continued to write controlled substance prescriptions for M.S.

Patient C.D.

83.   From in or about April 2016, to in or about October 2016, and from in or about February 2018, to in or about April 2018, Dr. Librach wrote 21 controlled substance prescriptions for Patient C.D.   According to C.D.'s medical file, Dr. Librach never met or evaluated C.D.   On 4 occasions, C.D. tested negative for the prescribed drugs and on 6 occasions tested positive for illicit drugs and/or non-prescribed controlled substances.   Despite knowing C.D. was not taking the prescribed drugs or tested positive for illicit drugs, Dr. Librach continued to write controlled substance prescriptions for C.D.

Patient D.M.

84.   From in or about August 2016, to in or about October 2016, and from in or about February 2018, to in or about April 2018, Dr. Librach wrote 24 controlled substance prescriptions for Patient D.M.   D.M.'s medical file indicated Dr. Librach never met or evaluated D.M.   Despite not knowing or evaluating D.M., Dr. Librach continued to write controlled substance prescriptions for D.M.

Patient C.M.

85.   From in or about March 2017, to in or about January 2018, Dr. Ali wrote 16 controlled substance prescriptions for Patient C.M.   For this period, there are no documented procedure notes or urine drug screens in C.M.'s medical file.   C.M.'s medical records also indicate Dr. Ali never met or evaluated C.M.   Despite this fact, Dr. Ali continued to write controlled substance prescriptions for C.M.

86.   On or about the dates listed below, in the Eastern District of Missouri and elsewhere,

24

ASIM MUHAMMAD ALI, M.D. and
STANLEY L. LIBRACH, M.D.,

the defendants herein, registrants under Title 21, United States Code, Sections 821 through 830,

did knowingly and intentionally distribute and dispense, and cause to be distributed and

dispensed, Schedule II controlled substances, outside the scope of professional practice and not

for a legitimate medical purpose:

| Count | Patient | Date of Prescription | Controlled Substance | Doctor Prescribing |
|-------|---------|----------------------|----------------------|--------------------|
| 2 | C.D. | 05/13/2016 | Oxycodone/APAP | Dr. Librach |
| 3 | D.M. | 09/29/2016 | Oxycodone/APAP Hydromorphone | Dr. Librach |
| 4 | C.M. | 08/18/2017 | Oxycodone HCL | Dr. Ali |
| 5 | B.R. | 07/29/2016 | Oxycodone HCL OxyContin | Dr. Librach |
| 6 | B.R. | 05/02/2017 | Oxycodone HCL | Dr. Ali |
| 7 | M.S. | 03/06/2017 | Oxycodone/APAP | Dr. Ali |
| 8 | M.S. | 02/26/2018 | Oxycodone/APAP | Dr. Librach |
| 9 | M.T. | 04/17/2016 | Oxycodone HCL Fentanyl 25/MCG/HR | Dr. Librach |
| 10 | M.T. | 11/22/2017 | Oxycodone/APAP | Dr. Ali |

All in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United

States, Section 2.

### Counts 11 to 20
### Obtaining Controlled Substance by
### Fraud, Deception, or Subterfuge
### 21 U.S.C. § 843(a)(3) and 18 U.S.C. § 2

87.     Paragraphs 1 to 34 and 38 to 73 are incorporated by reference as if fully set out

herein.

88.     On or about June 15, 2016, defendant E. Spates caused fraudulent prescription

(211305) for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at St. Louis

25

Hills Pharmacy.   The prescription bore the name of E. Spates. and listed the prescribing doctor as Dr. Librach.

89.     On or about August 22, 2016, defendants T. Spates and Price caused a fraudulent prescription (#29983) for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at Olive Street Pharmacy.   The prescription bore the name of Patient D.P. and listed the prescribing doctor as Dr. Librach.

90.     On or about February 28, 2017, defendant Herman caused two fraudulent prescriptions, one (#42061) for oxycodone Hcl 30mg, 90 count tablets, and one (#42062) for phentermine 37.5 mg, 30 count tablets, to be filled at Olive Street Pharmacy.   Erin Herman was listed as the patient and Dr. Librach was listed as the prescribing doctor.   When defendant Herman presented the prescriptions and received the oxycodone and phentermine tablets from the pharmacy, she knew the prescriptions were fraudulent.

91.     On or about May 22, 2017, defendant Price caused a fraudulent prescription (#4525370) for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at Walgreens Pharmacy, located at 9285 Halls Ferry Rd., Jennings, Missouri.   The prescription listed M.R. as the patient and listed Dr. Librach as the prescribing doctor.

92.   On or about July 27, 2017, defendant Price caused a fraudulent prescription (#4521559) for 30 mg oxycodone HCL, 120 count, tablets to be filled at Walgreens Pharmacy, 4218 Lindell Blvd., St. Louis, MO.   The prescription listed J.S. as the patient and listed Dr. Librach as the prescribing doctor.

93.     On or about August 7, 2017, defendant Price caused a fraudulent prescription (#4557455) for 30 mg oxycodone HCL, 90 count, tablets to be filled at Walgreens Pharmacy,

26

9285 Halls Ferry Rd., Jennings, MO.   The prescription listed G.B. as the patient and listed the prescribing doctor as Dr. Librach.

94.     On or about September 22, 2017, defendant Price caused a fraudulent prescription (#2221613) for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at Walgreens Pharmacy, 10500 St. Charles Rock Rd., St. Louis, MO, #15941.   The prescription bore the name of Patient T.A. and listed the prescribing doctor as Dr. Librach.

95.     On or about November 7, 2017, defendant Price caused a fraudulent prescription (#2059691) for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at SSM Health Pharmacy, 12266 De Paul Dr., Ste. 105, Bridgeton, MO.   The prescription bore the name of Patient F.E. and listed the prescribing doctor as Dr. Librach.

96.     On or about January 26, 2018, defendant Crosby caused a fraudulent prescription (#253420) for 10/325 mg oxycodone/acetaminophen, 120 count, to be filled at the CVS pharmacy in Florissant.   The prescription bore the name of Shaunta Crosby and listed the prescribing doctor as Dr. Librach.

97.     On or about May 14, 2018, defendant Crosby caused a fraudulent prescription (#2220453) for 10/325 mg oxycodone/acetaminophen, 120 count, to be filled at a Walgreens pharmacy in Ferguson.   The prescription bore the name of J.F. and listed the prescribing doctor as Dr. Librach.

98.     When the prescriptions, listed in paragraphs 88 through 97 above, were presented to the pharmacies and controlled substances were received from the pharmacies, the aforementioned defendants knew the prescriptions were fraudulent.

99.     On or about the dates listed below, in the Eastern District of Missouri,

27

ASIM MUHAMMAD ALI, M.D.,
ALEXIS DORJAY BUTLER,
SHAUNTA C. CROSBY,
ERIN MELISSA HERMAN,
VLADIMIR KOGAN,
JERRY DALE LEECH, D.C.,
STANLEY L. LIBRACH, M.D.,
DENIS J. MIKHLIN,
EBONY R. PRICE,
ERICA T. SPATES, and
TIJUANA A. SPATES,

the defendants herein, did knowingly and intentionally acquire and obtain possession of a

controlled substance, to wit:   Oxycodone, a Schedule II controlled substance, by

misrepresentation, fraud, forgery, deception, and subterfuge:

| Count | Patient | Date Prescription Written | Date Prescription Filled | Controlled Substance | Doctor Listed on Prescription |
|-------|---------|---------------------------|--------------------------|---------------------|-------------------------------|
| 11 | Erica Spates | 06/01/2016 | 06/15/2016 | Oxycodone/APAP | Dr. Librach |
| 12 | D.P. | 08/17/2016 | 08/22/2016 | Oxycodone/APAP | Dr. Librach |
| 13 | M.R. | 05/18/2017 | 05/22/2017 | Oxycodone/APAP | Dr. Librach |
| 14 | J.S. | 07/13/2017 | 07/27/2017 | Oxycodone/HCL | Dr. Librach |
| 15 | G.B. | 08/03/2017 | 08/07/2017 | Oxycodone/HCL | Dr. Librach |
| 16 | T.A. | 09/14/2017 | 09/22/2017 | Oxycodone/APAP | Dr. Librach |
| 17 | Erin Herman | 10/25/2017 | 10/26/2017 | Oxycodone/HCL | Dr. Librach |
| 18 | F.E. | 10/20/2017 | 11/07/2017 | Oxycodone/APAP | Dr. Librach |
| 19 | Shaunta Crosby | 01/25/2018 | 01/26/2018 | Oxycodone/APAP | Dr. Librach |
| 20 | J.F. | 05/08/2018 | 05/14/2018 | Oxycodone/APAP | Doctor #1 |

All in violation of Title 21, United States Code, Section 843(a)(3) and Title 18, United

States Code, Section 2.

### Counts 21 to 26
### Illegal Kickbacks for Referrals
### 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. §2

100.    Paragraphs 1 to 34, 38 to 44, and 67 to 73 are incorporated by reference as

if fully set out herein.

28

101.    On or about the dates listed below, in the Eastern District of Missouri,

ASIM MUHAMMAD ALI, M.D.,

the defendant herein, did knowingly and willfully offer and pay remuneration, (including a

kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind, to

Mikhlin, Dr. Leech, Dr. Librach, API, and IPM, to induce them to purchase, lease, order, and

arrange for and recommend the purchasing, leasing, and ordering, of a good and service, for

which payment may be made in whole or in part under a federal health care program, that is,

Dr. Ali and CDL paid Mikhlin, Dr. Leech, Dr. Librach, API, and IPM on a per specimen basis

for each urine specimen sent to CDL for testing:

| Count | Check Number | Date of Check | Amount of Check | Paid to | Payor |
|-------|--------------|---------------|-----------------|---------|-------|
| 21 | 2638 | 10/05/2016 | $14,595.00 | D. Mikhlin Enterprise | CDL |
| 22 | 2534 | 11/04/2016 | $12,110.00 | D. Mikhlin Enterprise | CDL |
| 23 | 2468 | 12/05/2016 | $12,565.00 | D. Mikhlin Enterprise | CDL |
| 24 | 3183 | 07/17/2017 | $ 1,200.00 | S.H. | CDL |
| 25 | 3065 | 04/30/2017 | $ 7,840.00 | Midwest Marketing | CDL |
| 26 | 3551 | 01/05/2018 | $10,000.00 | Midwest Marketing | CDL |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and Title 18,

United States Code, Section 2.

## Counts 27 to 32
## Illegal Kickbacks for Referrals
## 42 U.S.C. § 1320a-7b(b)(1)(B) and 18 U.S.C. § 2

102.    Paragraphs 1 to 34, 38 to 44, and 67 to 73 are incorporated by reference as

if fully set out herein.

103.    On or about the dates listed below, in the Eastern District of Missouri,

29

JERRY DALE LEECH, D.C.,
STANLEY L. LIBRACH, M.D., and
DENIS J. MIKHLIN,

the defendants herein, did knowingly and willfully solicit and receive remuneration, (including a

kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind,

from Dr. Ali and CDL, to purchase, lease, order, and arrange for and recommend the purchasing,

leasing, and ordering, of a good and service, for which payment may be made in whole or in part

under a federal health care program, that is, Mikhlin, Dr. Leech, Dr. Librach, API, and IPM

solicited and received remuneration from Dr. Ali and CDL on a per specimen basis for each

urine specimen sent to CDL for testing.

| Count | Check Number | Date of Check | Amount of Check | Paid to | Payor |
|-------|--------------|---------------|-----------------|---------|-------|
| 27 | 2638 | 10/05/2016 | $14,595.00 | D. Mikhlin Enterprise | CDL |
| 28 | 2534 | 11/04/2016 | $12,110.00 | D. Mikhlin Enterprise | CDL |
| 29 | 2468 | 12/05/2016 | $12,565.00 | D. Mikhlin Enterprise | CDL |
| 30 | 3183 | 07/17/2017 | $ 1,200.00 | S.H. | CDL |
| 31 | 3065 | 04/30/2017 | $ 7,840.00 | Midwest Marketing | CDL |
| 32 | 3551 | 01/05/2018 | $10,000.00 | Midwest Marketing | CDL |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B) and Title 18,

United States Code, Section 2.

### Counts 33 to 40
### Health Care Fraud Scheme
### 18 U. S. C. §§ 1347 and 2

104.    Paragraphs 1 to 34, 38 to 73, 77 to 85, and 88 to 98 are incorporated by

reference as if fully set out herein.

105.    On or about the dates listed below, in the Eastern District of Missouri,

30

ASIM MUHAMMAD ALI, M.D.,
ALEXIS DORJAY BUTLER,
SHAUNTA C. CROSBY,
ERIN MELISSA HERMAN,
VLADIMIR KOGAN,
JERRY DALE LEECH, D.C.,
STANLEY L. LIBRACH, M.D.,
DENIS J. MIKHLIN,
EBONY R. PRICE,
ERICA T. SPATES, and
TIJUANA A. SPATES,

the defendants herein, knowingly and willfully executed and attempted to execute, the above

described scheme or artifice to defraud Medicare and Missouri Medicaid, which are health care

benefit programs, in connection with the delivery and payment for health care benefits, items,

and services, that is, the defendants submitted, and caused to be submitted false reimbursement

claims for services or items that they knew were not provided or were medically unnecessary.

| Count | Patient | Patient Service | Date of Claim | Date of Prescription | Insurer | Provider |
|-------|---------|-----------------|---------------|----------------------|---------|----------|
| 33 | T.A. | Script | 09/17/2015 | 09/17/2015 | Medicaid | Dr. Librach |
| 34 | H.B. | Script | 02/20/2016 | 02/17/2016 | Medicare | Dr. Librach |
| 35 | R.C. | Script | 01/17/2018 | 01/10/2018 | Medicaid | Dr. Ali |
| 36 | J.G. | Script | 03/04/2017 | 02/23/2017 | Medicare | Dr. Librach |
| 37 | A.H. | Script | 04/25/2017 | 04/13/2017 | Medicaid | Dr. Librach |
| 38 | K.H. | Script | 01/17/2018 | 01/09/2018 | Medicare | Dr. Ali |
| 39 | M.J. | Script | 11/03/2017 | 11/02/2017 | Medicaid | Dr. Ali |
| 40 | C.P. | Script | 08/11/2015 | 08/11/2015 | Medicaid | Dr. Librach |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1.      Pursuant to Title 21, United States Code, Section 853(a), upon conviction of an

offense in violation of Title 21, United States Code, Sections 841(a)(1) or 843(a)(3), including

31

conspiracy to commit such offense, as set forth in Counts 1 through 20, the defendant(s) shall forfeit to the United States of America any property, constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation(s) and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such violation(s).   Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds obtained directly or indirectly as a result of such violation(s).

2.      Pursuant to Title 18, United States Code, Sections 982(a)(7), upon conviction of an offense in violation of Title 42, United States Code, Section 1320a-7b or Title 18, United States Code, Section 1347, including conspiracy to commit such offenses, as set forth in Counts 1, and 21 through 40, the defendant(s) shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.   Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

3.      Pursuant to Title 18, United States Code, Sections 982(a)(2)(b) and 1028(b), upon conviction of a conspiracy to violate Title 18, United States Code, Section 1028 as set forth in Count 1, the defendant(s) shall forfeit to the United States of America any property constituting, or derived from, proceeds the defendant(s) obtained, directly or indirectly, as a result of such violation and any personal property used or intended to be used to commit said offense.   Subject to forfeiture is a sum of money equal to the total value of the property constituting, or derived from, proceeds the defendant(s) obtained directly or indirectly, as a result of such violation.

32

4.     If any of the property described above, as a result of any act or omission of the

defendant(s):

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided

         without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p).

                  A TRUE BILL.


                  _____

                  FOREPERSON

JEFFREY B. JENSEN
United States Attorney


_____
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney